UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.  S5-4:15 CR 404(3) HEA/NAB |
| v. | ) | |
| | ) | **This is a Capital Case** |
| ANTHONY JORDAN, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

COMES NOW defendant, Anthony Jordan, by and through undersigned counsel, and moves to suppress as evidence any and all items seized by law enforcement officers from the following described properties and vehicles:  4223 West Sacramento, St. Louis, Missouri; 4217 East Sacramento, St. Louis, Missouri; 64 Brighton Park Drive, St. Charles, Missouri; a 2005 Pontiac Grand Prix; a 2004 Pontiac GTO Coupe; and a 2004 Silver Chevrolet Silverado SS; as well as any and all evidence derived therefrom, including, but not limited to, the search and extraction of information from a Samsung Galaxy SIII T-Mobile cellular phone discovered during the search of the 2005 Pontiac Grand Prix mentioned above.  In support of this motion, defendant states as follows:

I.      **FACTS**

      A.      **Search of 4223 West Sacramento**

      1.      On August 6, 2015, DEA Agent Eric Lanham applied for, submitted an affidavit in support of, and obtained a warrant to search the property located at 4223 **East** Sacramento, St. Louis, Missouri 63115.

2

2.      On August 7, 2015, a team of officers led by Agent Lanham and St. Louis Metropolitan Police Detective Leo Rice searched the residence at 4223 West Sacramento in lieu of 4223 **East** Sacramento, the address listed in the application, affidavit, and search warrant.  A number of items, including various firearms, were seized by law enforcement during the course of the search.

### B.    Search of 4217 East Sacramento

3.      On August 6, 2015, Agent Lanham also applied for, submitted an affidavit in support of, and obtained a warrant to search the property located at 4217 East Sacramento, St. Louis, Missouri 63115.

4.      The affidavit submitted by Agent Lanham in support of his request for the warrant to search 4217 East Sacramento was the same affidavit he submitted in support of his application for a warrant to search 4223 East Sacramento.  It described 4217 East Sacramento as the location of "a garage" which Jordan purportedly utilized "for the storage of vehicles, firearms, gloves, masks, and/or other items used to carry out or otherwise conceal the identity of himself or others involved in shootings."

5.      On August 7, 2015, a team of officers led by St. Louis Metropolitan Police Detective Marc Wasen searched the garage located at 4217 East Sacramento.  A number of items, including ammunition and several vehicles believed to be stolen, were seized by law enforcement during the course of the search.

**C.** **Protective Sweep of 64 Brighton Park Drive**

6. On August 26, 2015, a grand jury returned an indictment charging Jordan with three drug-related offenses, two of which were death eligible crimes in violation of 21 U.S.C. § 924(c) and (j).

7. On August 27, 2015, federal and state investigators arrested Jordan at his residence at 64 Brighton Park Drive in St. Charles County, Missouri.

8. When the police arrived to arrest Jordan, he was inside his residence with his three-year-old and five-month-old daughters.

9. After arresting Jordan and securing the children, a slew of law enforcement officers entered the residence, and conducted a protective "security sweep."

**D.** **Search of 64 Brighton Park Drive**

10. Following the protective sweep, and on the same day, law enforcement officers applied for and obtained a warrant to search the premises at 64 Brighton Park Drive, specifically defined in the warrant as "a two story, single family residence with a brick facade and black shutters in the front of the residence, with an attached two car garage, bearing the numbers '64' on the lefthand side."

11. During the course of the search, the police seized a number of items, including various firearms.

**E.** **Seizure of 2005 Pontiac Grand Prix**

12. In addition to the items seized from the residence located at 64 Brighton Park Drive, law enforcement officers seized a 2005 Pontiac Grand Prix that was parked in the driveway of the residence. The Grand Prix was not mentioned in the search warrant.

**F.    Seizure of Pontiac GTO and Chevrolet Silverado**

13.    On August 28, 2015, the police received a call from an employee at PUR Performance, 3725 Harry S. Truman Road, St. Charles, Missouri, informing them that the company was in possession of a Pontiac GTO and a Chevrolet Silverado SS that had previously been left at the shop by Anthony Jordan for automotive services.

14.    Following the call, Detective Dan Early of the St. Louis Metropolitan Police Department appeared at PUR Performance, seized the vehicles without a warrant, and had them towed to the FBI office located at 2222 Market Street in downtown St. Louis.

**G.    Searches of Pontiac Grand Prix, Pontiac GTO and Chevrolet Silverado**

15.    On September 16, 2015, Special Agent Brandon Burke obtained search warrants to search the Pontiac Grand Prix seized from the driveway of 64 Brighton Park Drive; and the Pontiac GTO and Chevrolet Silverado seized from PUR Performance.

16.    The vehicles were searched on September 26, 2015 at the FBI office located at 2222 Market Street in downtown St. Louis.

17.    The searches were supervised by Special Agent Burke, and included St. Louis Police Detectives Dan Early and Leo Rice.

18.    A number of items were seized from the Pontiac Grand Prix, including a T-Mobile Samsung Galaxy SIII phone, model: SGH-T99; an Apple iPod, model A1421; a black bag containing one 5.7 mm magazine containing twenty rounds; one .45 caliber magazine containing fifteen rounds; one 5.7 mm magazine containing nineteen rounds; and one .45 caliber magazine.

5

19.     Items seized from the Pontiac GTO include a black facial mask; a pair of black gloves; two .50 caliber rounds; and various paperwork, including vehicle registration papers in the name of defendant Jordan.

20.     A .45 caliber magazine loaded with thirteen rounds; a black glove; a gun case; and a sealed box of 5.7 mm x 28 mm ammunition were seized from the Chevrolet Silverado.

**H.     Searches of Fifteen Individual Cell Phones, Including Samsung Galaxy SIII, Model SGH-T99**

21.     On October 6, 2015, FBI Special Agent Brandon Burke obtained a search warrant to search 15 individual cell phones in the custody of the FBI, including the Samsung Galaxy SIII phone, model number SGH-T99 seized during the search of the Pontiac Grand Prix.

22.     Said search warrant directed any authorized law enforcement officer to search the described devices on or before October 14, 2015.

23.     Two weeks after the expiration of the search warrant, on October 28, 2015, law enforcement officers extracted information from the Samsung SGH-T99 Galaxy SIII cell phone, including, among other things, call logs, contacts, SMS matches, and data files.

## II.     ARGUMENT AND AUTHORITIES

24.     The Fourth Amendment prohibits general warrants by providing that "no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."  U.S. Const. amend IV.

25.     "Probable cause" is a fluid concept involving a common sense decision as to "whether, given all the circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

26.    The particularity requirement prevents general exploratory searches, and discriminatory rummaging through one's belongings. *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).

27.    To successfully challenge the issuance of a warrant, a defendant must show that the issuing court lacked a "substantial basis for concluding that probable cause existed." *Gates*, 462 U.S. at 238-39; *see also United States v. Kattaria*, 553 F.3d 1171, 1175 (8th Cir. 2009) (citing *United States v. LaMorie*, 100 F.3d 547, 552 (8th Cir. 1996)); *United States v. Buchanan*, 574 F.3d 554, 561 (8th Cir. 2009). "Whether a search warrant is supported by probable cause is determined by the totality of the circumstances." *Kattaria*, 553 F.3d at 1175.

28.    Warrantless searches "are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions. *Coolidge*, 403 U.S. at 454-55.

29.    The Fourth Amendment provides the same protection against warrantless seizures of property "even though no search within the meaning of the Amendment has taken place." *Sodal v. Cook County*, 506 U.S. 56, 68 (1992). When evidence gathered through a warrantless search is challenged through a motion to suppress, the government bears the burden of demonstrating that the search was justified by an exception to the Fourth Amendment's warrant requirement. *United States v. Kennedy*, 427 F.3d 1136, 1140 (8th Cir. 2005); *See also Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984); *United States v. Ramirez*, 676 F.3d 755, 760 (8th Cir. 2012). The same is true of warrantless seizures. *See, e.g.*, *United States v. Lewis*, 864 F.3d 937, 947 (8th Cir. 2017) ("[t]he Government failed to carry its burden to show the initial warrantless seizure . . . was permitted").

7

A.    **All Items Seized From 4223 West Sacramento Should Be Suppressed.**

    i.    **The items seized from 4223 West Sacramento should be suppressed because the police searched the wrong residence.**

30.    As detailed in section I.A, *supra*, in the course of executing the warrant issued for 4223 East Sacramento, law enforcement officers searched the residence and property at 4223 West Sacramento instead.  All of the items seized during that search must be suppressed because they were the subject of a warrantless search.  Officials never applied for, or obtained, a warrant to conduct the search of the property at 4223 **West** Sacramento.

31.    The warrantless search of 4223 West Sacramento was not supported by a lawfully recognized exception to the Fourth Amendment warrant requirement.  The good faith exception to the warrant requirement outlined in *United States v. Leon*, 468 U.S. 897 (1984), does not apply to justify the search because the officers who executed the warrant were familiar with the area, and proceeded with the search of 4223 West Sacramento despite knowing that it was not 4223 West Sacramento listed in the application, affidavit, and search warrant.  *See id.* at 922-23.

32.    The officers' knowledge of the surrounding area is evidenced by the fact that, at the same time that the warrantless search of 4223 West Sacramento was taking place, law enforcement personnel were simultaneously searching the property located at 4217 ***East*** Sacramento, a mere three doors down from the property listed in the warrant.  Indeed, law enforcement personnel had supported their request for the two searches with the same affidavit; the searchers were part of a single investigation.  From this, the officers would necessarily have been aware that St. Louis's Sacramento Avenue was divided into "East" and "West" sections.  Any reasonable officer would have wondered why the two simultaneous searches were taking place several blocks away from one another, when the addresses listed in the recently-obtained

8

search warrants – 4217 East Sacramento and 4223 East Sacramento – were a mere six digits apart. Surely the officers searching the two properties would have noticed that the two searches were occurring **several blocks** apart from one another, when the two warrants clearly authorized searches of two properties which were **three doors** apart from one another. *See* Fig. 1, below.



*Fig. 1*

33.    Where, as here, law enforcement officers conduct a warrantless search, the validity of that search depends on whether the officer's failure to acknowledge the absence of a warrant "was objectively understandable and reasonable." *Maryland v. Garrison*, 480 U.S. 79, 88 (1987). In *Garrison*, officers obtained a warrant that authorized the search of a floor of an apartment building, without recognizing that there were two apartments on that floor or distinguishing between the two apartments. Warrant in hand, the officers then searched the wrong apartment. *Id.* at 80. In evaluating the reasonableness of the officers' conduct in order to

determine whether the items seized during the search should be suppressed, the Court examined the "objective facts available to the officers at the time" of the search. *Garrison*'s "focus on reasonableness is emblematic of the Supreme Court's general approach to the Fourth Amendment," and consequently serves as a touchstone for the validity of any warrantless search. *United States v. Houck*, 888 F.3d 957, 961 (8th Cir. 2018). As a result, a warrantless search is valid only where the officers involved have "t[aken] every step that could reasonably be expected of them" to clarify the scope of the search. *Massachusetts v. Sheppard*, 468 U.S. 981, 989 (1984).

34.    Accordingly, any evaluation of the validity of the search of 4223 West Sacramento depends on the reasonableness of the executing officers' conduct in conducting the search without a warrant. Here, the officers did not take reasonable steps to ensure that they were searching the correct property, *see id.*; indeed, they could and should have recognized (and likely did recognize) that they were searching a property on ***West*** Sacramento Avenue, whereas the warrant authorized them to search a property on ***East*** Sacramento Avenue. A hearing is appropriate in this context so that the Court may determine what objective "information [was] available to" the officers at the time that they carried out the warrantless search. *See Garrison*, 480 U.S. at 85.

35.    In cases where it has relied on this reasonableness standard to uphold searches that were erroneously conducted without a warrant, the Eighth Circuit has routinely cited its decades-old decision in *United States v. Gitcho*, 601 F.2d 369 (8th Cir. 1979). *See, e.g.*, *United States v. Thomas*, 263 F.3d 805 (8th Cir. 2001). But *Gitcho* involved a fact pattern very different from the situation at issue here, and should not control. In *Gitcho*, officers mistakenly obtained a

warrant for an address that *did not exist*, even though the executing agents were highly familiar with the property that they intended to (and ultimately did) search.  601 F.2d at 370-71.  The court observed that the validity of the search was "admittedly close," but ultimately found itself reassured by the fact that the address erroneously listed in the warrant was not a real property. *Id.* at 372.  This mitigated the risk of a "mistaken search of the wrong property."  *Id.*  This circumstance is not present here: the search warrant authorized the search of a property that *did* exist, making it highly likely that a "mistaken search of the wrong property" would occur.  *See id.*

36.     This case is instead comparable to *United States v. Herron*, 215 F.3d 812 (8th Cir. 2000), where the Eighth Circuit suppressed evidence seized during a search of a defendant's residence.  Officers had applied for and obtained warrants to search a farm where members of the defendant's family grew marijuana, and for defendant's residence, basing both applications on a single affidavit which provided no probable cause for the conclusion that marijuana would be found at the residence.  *Id.* at 813-14.  In addition to the fact that the affidavit was deficient, the court emphasized that "the officers involved *should have been fully aware* of th[ose] deficiencies . . . ."  *Id.* (emphasis added).  Here, too, there is every indication that the law enforcement personnel involved were familiar with the Sacramento Avenue area, and would necessarily have been aware that they meant to search a property on *West* (and not East) Sacramento Avenue.  Only through a hearing can the scope of the officers' knowledge on this point become clear.

37.     Indeed, in situations like this one where a warrant is issued in error, it is routine for law enforcement personnel to correct the mistake before undertaking a warrantless search of

11

the wrong premises.  In *United States v. Skarda*, 845 F.3d 370 (8th Cir. 2016), officers did just that, contacting a magistrate prior to the search as soon as they realized that the warrant they had previously obtained authorized a search of the wrong address.  The officers explained the situation to the magistrate, edited the warrant, initialed the change, and obtained the magistrate's approval. Only then did they execute a search of the intended property—a search which the Eighth Circuit upheld.  *Id.* at 373-74, 377.  Officers could and should have done the same here. Before executing the search of 4223 West Sacramento, they should have realized (and perhaps they did realize) that the warrant authorized a search of the wrong property—and at that point they could easily have contacted a magistrate to correct the error.  Their failure to do so—despite the existence of a clear and straightforward process for amending the deficient warrant— underscores the unreasonableness of their approach.  For the foregoing reasons, Mr. Jordan requests an evidentiary hearing so that the Court may determine what information was available to the officers at the time of the warrantless search, and whether they acted reasonably in carrying out the search despite that information.

> ii.    **The items seized from 4223 West Sacramento should be suppressed because the warrant was not returned promptly.**

38.    Alternatively, the search warrant for 4223 East Sacramento is defective because although it was issued on August 6, 2015 and executed the next day, it was not returned until October 19, 2015—more than ten weeks after its issuance and execution.  Rule 41(f)(1)(D) of the Federal Rules of Criminal Procedure mandates that after a warrant is executed, the executing officer "must promptly return it" along with an inventory to the designated magistrate judge. When an executing officer violates Rule 41(f)(1)(D)'s prompt-return requirement, the appropriateness of exclusion as a remedy depends on whether the defendant has shown either

that he was prejudiced or that the officer acted in reckless disregard of the requirement. *United States v. Beckmann*, 786 F.3d 672, 681 (8th Cir. 2015); *see also United States v. Easton*, No. 1:14-cr-00017, 2014 WL 5791560 at *10 (Crites-Leoni, M.J.) (Rule 41 violation did not merit exclusion because the defendant had not asserted "any prejudice" or "that there was an intentional and deliberate disregard of the provision requiring that the warrant be returned"). Here, whether the executing officer acted in reckless disregard of Rule 41(f)(1)(D)'s return requirement is a factual issue that can and should be resolved through an evidentiary hearing.

> **B.      All Items Seized From 4223 West Sacramento And 4217 East Sacramento Should Be Suppressed Because The Warrants Were Based On Stale Information.**

39.      Alternatively, the search warrant for 4223 East Sacramento is defective, as is the search warrant for 4217 East Sacramento, because the affidavit submitted in support of the two warrants was based on stale and non-corroborated hearsay information from cooperating witnesses.  On information and belief, and as the affidavit in support of the applications for the warrants suggests, law enforcement officers based their request on information provided by the cooperating witness during a July 21, 2015 "drive-around."  At that time, the witness identified the subject properties as locations where evidence might be found.  Yet the same cooperating witness had been arrested on January 30, 2015, and was in custody for the five and a half months preceding the "drive-around."  He could not have known whether the properties were still being used (as he claimed) in July 2015 to support a narcotics-trafficking operation, and there was no probable cause to believe that *at the time of the search* the residence or garage would contain evidence of a crime.  The stale and uncorroborated information provided by the cooperating

witness did not provide officers with probable cause to believe that contraband or evidence of a crime would be found on the premises.

40.     If the information supporting a warrant "is not sufficiently close in time to the issuance of the warrant and the subsequent search conducted," then probable cause cannot be "said to exist at the time of the search." *United States v. Colbert*, 828 F.3d 718, 727 (8th Cir. 2016) (citing *United States v. Brewer*, 588 F.3d 1165, 1173 (9th Cir. 2009)).  Whether the information is "sufficiently close in time" to the issuance and the search depends on a number of factors which include the "lapse of time," the "nature of the criminal activity" in question, and the "kind of property" seized. *Id.*  There is "no fixed formula for determining when information has become stale"; rather, "[t]he timeliness of the information supplied in an affidavit depends on the circumstances of the case." *United States v. Smith*, 266 F.3d 902, 905 (8th Cir. 2001) (citations omitted).

41.     The exclusion of evidence seized based on stale information makes sense in light of the fact that a search's validity hinges on the existence of probable cause, and probable cause depends, in turn, on whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Kennedy*, 427 F.3d at 1141 (8th Cir. 2005).  It is "axiomatic that probable cause must exist at the time of the search and not merely at some earlier time." *Id.* It is the government's burden to demonstrate that probable cause existed ***at the time of the search*** and not merely at some earlier time.  *Id.*

42.     In *Kennedy*, the Eighth Circuit upheld the exclusion of evidence seized pursuant to a search that had been carried out based on stale information—and, therefore, without probable cause.  There, the trial court had concluded—after a hearing—that officers had lacked

14

probable cause to search the defendant's vehicle for methamphetamine, since the informant who provided the information that gave rise to the search had not seen drugs in the defendant's car in at least six months. *Id.*

43.    The same result is appropriate here. In the applications for the two search warrants, Agent Lanham posited that evidence of an ongoing narcotics operation would be found in the subject properties based on information provided in July 2015 by a cooperating witness. But that cooperating witness had been in custody, and had therefore not been in the subject property, in at least five and a half months.  Any supposition by that witness that the properties contained evidence of a crime was "stale," and could not have provided probable cause for the assumption that evidence would be found there in August 2015.

44.    Since "[t]here is "no fixed formula for determining when information has become stale," *see Smith*, 266 F.3d at 905, a hearing is appropriate so that Mr. Jordan may present evidence as to why the circumstances of this case do not support probable cause for the two searches.

**C.    All Items Seized From 64 Brighton Park Drive Should Be Suppressed.**

**i.    The search warrant for 64 Brighton Park Drive is defective because it was based on information obtained during the course of an overbroad protective security sweep.**

45.    Anthony Jordan was arrested outside of his residence at 64 Brighton Park Drive on August 27, 2015.

46.    In *Maryland v. Buie*, 494 U.S. 325 (1990), the Supreme Court held that the Fourth Amendment permits a limited protective sweep in connection with an in-home arrest when law enforcement officers possess a reasonable belief based on specific and articulable facts that the

area to be swept harbors an individual(s) causing a danger to those on the scene. The Court defined a protective sweep as "a quick and limited search of the premises . . . narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id*. at 334. A protective sweep may last "no longer than it takes to complete the arrest and depart the premises." *Id*. at 335-36.

47.    Accordingly, following the arrest and removal of defendant Jordan from his premises, a multitude of law enforcement officers entered the residence without a warrant under the guise of conducting a protective sweep. One or more officers remained in the house for over 50 minutes without a search warrant.

48.    The "protective sweep" was illegal, in violation of the Fourth Amendment, because the officers were unaware of any facts that would give rise to a reasonable suspicion that dangerous individuals were in the house "ready to launch an attack." *See United States v. Waldner*, 425 F.3d 514, 517 (8th Cir. 2005) (alleged protective sweep exceeded its permissible scope under the Fourth Amendment where the officers had no reason to believe that an unknown individual might be in the house ready to launch an attack). Indeed, as the officers knew, the only people in the house with Jordan were an infant and a small child. Even if the officers had harbored a reasonable suspicion of the presence of a danger in the house (which they did not), this would not have justified the fact that one or more officers remained in the residence for more than 50 minutes as part of the supposed sweep.

49.    The officers used information obtained during the course of the illegal protective search to obtain a search warrant to search defendant's residence at 64 Brighton Park Drive. Items seized from the residence pursuant to the tainted search warrant were "impermissible

fruits" of the illegal security sweep.  *See United States v. Noushfar*, 78 F.3d 1442, 1447-48 (9th

Cir. 1996).

> ii.    **The search warrant for 64 Brighton Park Drive is defective because the affidavit tendered in support of the warrant fails to establish probable cause.**

50.    The affidavit proffered in support of the search warrant for 64 Brighton Park

Drive failed to set forth sufficient facts or create a fair probability that evidence of a crime would

be found at 64 Brighton Park Drive.

51.    The affidavit begins by detailing the arrest of Jordan on August 27, 2015 at 64

Brighton Park Drive.  The affidavit further alleges that Jordan told officers there were three

handguns inside the middle dresser drawer in his bedroom.

52.    There is nothing in the affidavit that indicates that Jordan was a convicted felon or

otherwise prohibited from possessing a firearm (which he was not).  Indeed, the search warrant

discounts the possibility that Jordan had a license for the guns he described keeping at the

residence.  The alleged presence of firearms in the home formed a core basis for the officers'

subsequent application for a warrant to search the property.  This justification is not valid

because it does not account for the possibility that the firearms were lawfully kept there, and

accordingly, it does not provide the requisite probable cause.

53.    The affiant relates how law enforcement had received detailed information from a

cooperating witness described as one of Jordan's former associates.  According to the affidavit,

the cooperating witness told law enforcement officers that he participated in the distribution of

drugs and in a number of shootings and murders with Jordan.  But, there is nothing in the

affidavit to suggest that any illegal activities occurred at the Brighton Park Drive address or that

17

any guns located at said address had been used in any criminal activity.  Furthermore, on information and belief, the cooperating witness in question said nothing to law enforcement officers about the Brighton Park Drive address.  Indeed, there is no indication that the cooperating witness had ever even been to the Brighton Park Drive address.

54.    The remainder of the affidavit contains boilerplate language relating to drug traffickers in general.  The affidavit contains no specific information as to the presence of any contraband or evidence at 64 Brighton Park Drive.

55.    Given the conclusory and vague circumstances and details contained in the affidavit, the affidavit fails to create a fair probability that evidence of a crime would be found at 64 Brighton Park Drive.  Accordingly, any and all evidence seized in conjunction with the search warrant for the premises should be suppressed.

**D.    The Pontiac Grand Prix And All Items Collected Therefrom Should Be Suppressed.**

**i.    The seizure of the Pontiac Grand Prix was not authorized by the search warrant for 64 Brighton Park Drive.**

56.    The warrant authorizing the search of the premises located at 64 Brighton Park Drive did not authorize the seizure of the Pontiac Grand Prix.

57.    The search warrant specifically defined the premises as "a two story, single family residence . . . with an attached two car garage[.]"  *See* Aug. 27, 2015 Search Warrant (JAV00001014).[1]

---

[1] When she signed the warrant authorizing the search of the premises located at 64 Brighton Park Drive on August 27, 2015, Magistrate Judge Collins hand-wrote the date "8/27/**2014**" (emphasis added).  This appears to have been an inadvertent error, and the defense is not raising it as a basis for challenging the searches of the Brighton Park Drive property or of the vehicle seized there.

58.     At the time of the application for the search warrant, the Grand Prix was parked in the driveway of Jordan's residence in an area clearly visible from the street, outside of the premises described in the warrant.

59.     The agents who applied for the search warrant were fully aware of the location of the Grand Prix, having been present at 64 Brighton Park Drive during the time of Jordan's arrest.

60.     The Fourth Amendment provides that every search warrant shall particularly describe "the place to be searched and the persons or things to be seized."  U.S. Const. amend. IV.

61.     The particularity requirement "prevents the seizure of one thing under a warrant describing another."  *Marron v. United States*, 275 U.S. 192, 196 (1927).

62.     The search warrant for the premises at 64 Brighton Park Drive did not authorize the seizure of the Grand Prix.  Said vehicle was not particularly described in the warrant, nor was it found on the premises as defined in the warrant.

> ii.     **The automobile exception to the warrant requirement does not justify the seizure of the Pontiac Grand Prix.**

63.     The automobile exception to the warrant requirement allows the police to seize and/or search a motor vehicle provided they have probable cause to believe that the vehicle contains contraband.  *California v. Carney*, 471 U.S. 386 (1985); *Carroll v. United States*, 267 U.S. 132 (1925).

64.     The justification for the automobile exception is two-fold: the ready mobility of a vehicle, and the lesser expectation of privacy that one has in their automobile due to government regulations and controls.  *Carney*, 471 U.S. at 390-92.

65.　As recognized by implication in *Carney*, the justifications for the automobile exception do not apply where a motor vehicle is not being used on the highway, and is found in a stationary place regularly used for residential purposes. *Id*. at 392-93.

66.　At the time of the seizure of the Grand Prix, Mr. Jordan was in custody, and the car was parked in his residential driveway. Unlike in *Carroll* and its progeny, mobility was not an issue, and it would not have been impractical for the police to secure a warrant. *See Carroll*, 267 U.S. at 153.

67.　The police had ample opportunity to apply for a warrant to search the Grand Prix, and its seizure is not justified by the automobile exception to the warrant requirement. *See Coolidge*, 403 at 458-62 (warrantless seizure of defendant's car parked in the driveway of his residence following his arrest was not justified by the automobile exception).

### iii.　The seizure of the Pontiac Grand Prix was not justified by the plain view exception to the warrant requirement.

68.　The plain view exception to the warrant requirement allows the warrantless seizure of evidence of a crime provided that the seizing officer is lawfully located in the place from which the item is plainly viewed; the item's "incriminating character" is immediately apparent; and the officer has "a lawful right of access to the object itself." *See Horton v. California*, 469 U.S. 128, 136-37 (1990).

69.　For the plain view doctrine to apply, it is essential "that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." *Id*. at 136.

70.　The police had no rightful access to the Grand Prix parked in Jordan's driveway, and the seizure of the car was accomplished by means of a warrantless trespass. *See Coolidge*,

403 U.S. at 465-72 (where, as suggested by the Court in *Horton v. California*, 496 U.S. at 137, the seizure of Coolidge's car parked in the driveway was accomplished by means of a warrantless trespass on Coolidge's property). Morevoer, there was no "immediately apparent" incriminating character to the vehicle that would have justified its seizure. *See Horton*, 469 U.S. at 136-37.

71.     The seizure of the Grand Prix was not authorized by the plain view exception to the warrant requirement. *See Collins v. Virginia*, 138 S. Ct. 1663, 1671-73 (2018) (seizure of motorcycle parked within the curtilage of home is not justified by the automobile exception where the police have no lawful right of access to the car).

### iv.     The search warrant for the Pontiac Grand Prix was the fruit of its illegal seizure.

72.     The search warrant for the Grand Prix was the direct result of the government's exploitation of its illegal seizure, and any items seized pursuant to that search warrant must be suppressed. *See Wong Sun v. United States*, 371 U.S. 471 (1963).

73.     Alternatively, the search warrant for the Grand Prix is defective in that the affidavit tendered in support of the warrant fails to establish probable cause to believe there was a fair probability that contraband or evidence would be found in the car. Rather, the affidavit seeks to justify the search of the Grand Prix and three other vehicles through conclusory statements that lack the requisite specificity. For example, the affiant states that unspecified "interviews" with "numerous witnesses, confidential informants, and parties related to the investigation," together with "other aspects of the case," demonstrate Jordan's "past utility" of the four subject vehicles "to further his criminal organization. Though officers purportedly received information from a cooperating witness about the use of the Grand Prix in criminal

21

activities, they also supported their request for a search warrant by claiming to have observed semi-automatic firearm magazines in plain view therein. Once again, this assertion provides no probable cause for a search, as it discounts the possibility that Jordan lawfully possessed firearms. Thus, these vague and unsupported claims fail to satisfy the particularity requirement. *See Marron*, 275 U.S. at 196.

**E.    The Vehicles Seized From PUR Performance Center And All Items Collected Therefrom Should Be Suppressed**

74.    On August 28, 2015, one day after Jordan's arrest, the FBI and DEA were contacted by someone at the PUR Performance Center in St. Charles, Missouri regarding two vehicles belonging to Jordan which were on the lot. One vehicle was described as a 2004 Pontiac GTO and the other was described as a 2004 Chevrolet SS Silverado.

75.    According to PUR Performance records, Jordan dropped the vehicles off at the location on August 4, 2015. At the time he dropped the vehicles off he provided his name and an updated telephone number to employees at the location. Customer records showed that Jordan was a "loyal customer" for about five years and would routinely drop vehicles off for service. Additionally, it was not unusual that the vehicles would remain at the location for an extended period of time following service prior to being reclaimed by Jordan.

76.    During the phone call placed to FBI/DEA on August 28, 2015, the caller indicated he had learned of Jordan's arrest the day before on the news. In response to the call, Detective Dan Early of the St. Louis Metropolitan Police Department, responded to the location and, after consulting with Assistant United States Attorney Michael Reilly, seized both vehicles without consent from Jordan and without a warrant.

i.    **The warrantless seizure of the vehicles from PUR Performance Center was in violation of the Fourth Amendment.**

77.    A seizure of property occurs when the government intrudes on the property of another and thereby "meaningfully interferes" with that individual's possessory interest in the property.  *Coleman v. Watt*, 40 F.3d 255, 263 (8th Cir. 1994); *see also United States v. Clutter*, 674 F.3d 980, 984 (8th Cir. 2012).  "The reasonableness standard of the Fourth Amendment applies to any seizure by the government in any context."  *Coleman*, 480 F.3d at 263.  Whether or not a search is constitutionally reasonable has been evaluated based on whether it actually constituted a "seizure," whether officers had a legitimate interest in avoiding destruction of the seized property, and whether the seizure was supported by probable cause.  *See, e.g.*, *Clutter*, 674 F.3d at 984-85; *United States v. Beasley*, 688 F.3d 523, 529-30 (8th Cir. 2012).

78.    In situations where a seizure is carried out with the consent of a third party, courts also evaluate the validity of that consent, inquiring whether the individual who consented to the seizure had actual or apparent authority to do so.  *See Clutter*, 674 F.3d at 985; *Beasley*, 688 F.3d at 530.  Courts also look to whether officers acted reasonably in light of this actual or apparent authority.  *See, e.g.*, *Beasley*, 688 F.3d at 530; *cf. Marvin v. United States*, 732 F.2d 669 (8th Cir. 1984) (after a third party consented to a search without actual or apparent authority to do so, the seizure of items pursuant to that search was constitutionally unreasonable).

79.    The employee of PUR Performance who turned over the vehicles to law enforcement lacked actual or apparent authority to consent to the seizure of those vehicles, rendering that seizure constitutionally unreasonable.  Indeed, the officers who responded to PUR Performance were well aware that the vehicles were on the business's premises for repairs.  Employees informed the officers that Jordan routinely brought vehicles to the business for

23

maintenance.  They further informed officers that it was routine for the vehicles to remain at PUR Performance for an extended period of time before being picked up by Jordan.  Under these circumstances, any authority granted to the business by Jordan would have extended only to entering the vehicles for repair purposes, driving the vehicles on the premises to facilitate those repairs, and carrying out any other maintenance requested by Jordan.  It was not reasonable for officers to conclude that Jordan had authorized employees of PUR performance to consent to the seizure of Jordan's vehicles by law enforcement.

80.     Further, the seizure of the vehicles was not supported by probable cause.  The employees of PUR performance gave officers no indication that the vehicles were linked to any criminal conduct, and gave officers no reason to believe that evidence would be found therein. To the contrary, employees described Jordan as a loyal customer who regularly had his vehicles serviced by PUR Performance.  Neither the officers nor the PUR employees observed any contraband in plain view inside of the car.  Employees of the business relayed to law enforcement that they had on occasion observed weapons and ammunition inside Jordan's vehicles.  But there is no indication that Jordan possessed these weapons or ammunition unlawfully; law enforcement evidently discounted the possibility that Jordan was licensed to carry the weapons in question.  Moreover, there is no indication that firearms were ever observed in either the Pontiac GTO or the Chevrolet Silverado.

81.     The Northern District of Iowa's recent decision in *United States v. Fife*, 356 F. Supp. 3d 790 (N.D. Iowa 2019), is instructive.  There, the court suppressed evidence gathered from a computer hard drive that had been offered to law enforcement by the defendant's family friend.  After receiving the hard drive, law enforcement waited six months before obtaining a

warrant to search it.  The *Fife* court found the seizure of the hard drive unreasonable for Fourth Amendment purposes.  In addition to considering the unreasonableness of the six-month delay, the court noted that the defendant had not consented to the search, even though the computer at issue "belonged to him and no one else" and he had password-protected it.  The court reasoned that when a private party "lack[s] common authority to consent to" a seizure and does so anyway, "law enforcement may not seize the property indefinitely without obtaining a warrant when the evidentiary or illegal character of the property is not 'plain' from looking at it."  *Id.* at 806.

82.    Though officers in *Fife* had delayed six months before obtaining a warrant to search the seized hard drive, the *Fife* court based its conclusion largely on the Eleventh Circuit's 2009 decision in *United States v. Mitchell*, 565 F.3d 1347 (11th Cir. 2009).  *Mitchell*, in turn, involved the reasonableness of the seizure of a hard drive in light of officers' delay in obtaining a warrant after it was seized.  Even though the officers had delayed for only twenty-one days, the Eleventh Circuit found that this delay was unreasonable and required suppression.  Here, too, officers waited almost three weeks before obtaining a warrant to search the vehicles seized from PUR Performance – a constitutionally unreasonable delay.

83.    Here, as in *Fife*, officers acted unreasonably—both in effecting a warrantless seizure that was not consented to by a person who had "actual or apparent authority" to so consent, and in delaying unnecessarily before seeking a warrant to search the vehicles.  "Reasonableness" remains the touchstone of any warrantless seizure, *see Coleman*, 480 F.3d at 263, and here, there was no basis for the officers to take the steps that they took in recovering the

two vehicles from PUR Performance.    The seizure of the vehicles was constitutionally unreasonable, and should be invalidated under the Fourth Amendment.

> ii.    **The search warrant for the vehicles seized from PUR Performance Center was the fruit of their illegal seizure and was not supported by probable cause.**

84.    The search warrants for the Pontiac GTO and the Chevrolet Silverado that were seized from PUR Performance resulted directly from the government's constitutionally unreasonable seizure of the two vehicles, and any items seized pursuant to those search warrants must be suppressed. *See Wong Sun*, 371 U.S. 471.

85.    Alternatively, the search warrants for the two vehicles seized from PUR Performance are deficient, and the searches conducted pursuant to those warrants should be invalidated, because the information provided in support of the applications for those warrants did not give rise to probable cause.  In seeking the search warrants, officers submitted a single affidavit lacking in particularity as to why they believed they would find contraband or other evidence in the vehicles. Indeed, the affiant relayed that the vehicles were being kept at PUR Performance for servicing; the Pontiac GTO had a maintenance slip that stated "Tranny Slipping" (in apparent reference to the car's transmission), and the Chevrolet Silverado's air-conditioning system needed work.  Employees of PUR Performance described Jordan as a loyal customer who regularly brought his cars to the business for service.

86.    There is no indication in the affidavit that contraband or evidence of a crime would be found in the vehicles.  With respect to the Pontiac GTO, the affiant relayed, in vague, unsubstantiated and uncorroborated terms, that the FBI had "received information during the course of the investigation" that, at some unspecified time, Jordan had used the car "to transport

and distribute drugs, commit shootings, and flee from law enforcement."  Nowhere does the affidavit specify that drugs were being transported in the GTO at or near the time of the seizure, or that any other evidence had conceivably been in the car at or near the time of the seizure. Without particular ***and recent*** information about the possibility that evidence or contraband will be located, a search warrant lacks the requisite particularity. *See Kennedy*, 427 F.3d at 1141 (suppressing methamphetamine seized from a defendant's car because witness whose testimony gave rise to warrant had not seen drugs in the car for more than six months prior to the search). As for the Chevrolet Silverado, the affiant submits that a cooperating witness reported that, at some unspecified time in the past, Jordan had used the vehicle "to pull a trailer, which contained drugs."  Again, this vague assertion gives no indication that drugs (or anything else) might be in the vehicle at or near the time of the search, and is therefore insufficient to support probable cause.

87.    Even more problematic is the fact that the affidavit, which served as the basis for issuance of the warrant, seems to suggest that probable cause existed because PUR Performance employees had observed weapons and ammunition in the Chevrolet Silverado and in other of Jordan's vehicles (though not, apparently, in the Pontiac GTO).  Tens of millions of Americans are licensed to lawfully carry firearms, and the fact that a person chooses to do so does not give rise to probable cause that his vehicles will contain contraband or evidence of a crime.  Yet here, the warrant application completely discounts the possibility that Jordan kept firearms and ammunition because he had a license to do so.  Without an assertion that the firearms and ammunition were not in Jordan's car lawfully, the purported presence of those items does not give rise to probable cause.

88.    For these reasons, the warrants to search the Pontiac GTO and the Chevrolet Silverado should be invalidated, and the items seized from the two vehicles should be suppressed.

**F.    Any And All Information Obtained From The Search Of The Fifteen Cell Phones Is Subject To Suppression**

**i.    The fifteen cell phones were illegally searched after the expiration of the search warrant.**

89.    As set forth in section I.H, *supra*, on October 6, 2015 law enforcement officers obtained a warrant authorizing them to search fifteen individual cell phones within eight days—no later than October 14, 2015.   Not until October 28, 2015, two weeks after the expiration of the warrant, did officers extract information from the fifteen phones.

90.    Rule 41(e) of the Federal Rules of Criminal Procedure is unambiguous that any warrant must command the officer to execute the warrant within no more than fourteen days, and here, the warrant did so by directing execution within eight days of issuance.  Where a warrant seeks electronically stored information, such as on a cell phone, the deadline for execution refers to "the seizure of on-site copying of the media or information" in question.  Fed. R. Crim. P. 41(e)(2)(B).

91.    Where a warrant is executed in contravention of Rule 41's requirements, exclusion of the seized evidence can be appropriate where there is a constitutional infirmity or "if a defendant is prejudiced or if reckless disregard of proper procedure is evident." *United States v. Nyah*, 928 F.3d 694, 700-01 (8th Cir. 2019) (citing *United States v. Spencer*, 439 F.3d 905, 913 (8th Cir. 2006)).   These issues—particularly the issue of whether officers acted in reckless disregard of Rule 41's requirement and the deadline set forth on the face of the

warrant—are factual questions that should be resolved with reference to evidence to be adduced at a hearing. Accordingly, Jordan respectfully requests that this court conduct a suppression hearing so that these issues can be explored further.

### ii. The warrant to search the fifteen cell phones was premised on the false assertion that Jordan had a felony conviction.

92. The warrant authorizing the search of the fifteen cell phones is additionally problematic because the affidavit submitted in support of the application for that warrant was premised on the false statement that Jordan "has a 2005 conviction for Unlawful Use of Weapon." Without this unsupported and untrue claim that Jordan was a convicted felon, the affidavit would likely not give rise to probable cause for the search.

93. If an affiant makes a false statement knowingly or intentionally, or with reckless disregard for the truth, in a warrant affidavit, and if that statement is necessary to the finding of probable cause, the defendant is entitled to a hearing. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). Stated differently, a defendant may request and obtain an evidentiary hearing upon a showing that the affidavit supporting the warrant "contained false statements or omissions that were material to the finding of probable cause." *United States v. Oleson*, 310 F.3d 1085, 1090 (8th Cir. 2002); *see also, e.g.*, *United States v. Anton*, 546 F.3d 1355, 1358 (11th Cir. 2008) (finding probable caused based on defendant's felon status because "convicted felons . . . typically store [firearms] on their property").

94. Here, the statement that Jordan had been convicted of a felony is demonstrably false, and without it, it is entirely likely that the magistrate would not have found probable cause to issue the warrant. Mr. Jordan submits that the statement was not the result of mere negligence

on the part of the affiant, who could (and should) have verified Jordan's criminal record before attempting to describe it in the affidavit.

95.    "A full evidentiary hearing is essential to determine whether the government can show that the affidavit did not contain false statements, or that any false statements were not necessary to the showing of probable cause, or were not made intentionally or with reckless disregard for the truth."  *United States v. Maxwell*, 778 F.3d 719, 732 (8th Cir. 2015). Accordingly, Mr. Jordan respectfully requests an evidentiary hearing on the issue of the falsity of the statement that he has a felony conviction.

III.    **CONCLUSION**

96.    Additional authority will be provided after the facts are developed at the evidentiary hearing and additional discovery has been received.

WHEREFORE, defendant Jordan requests that this Court conduct an evidentiary hearing regarding the above-mentioned searches and seizures and thereafter, for each and all of the foregoing reasons, issue its order suppressing any and all evidence obtained by the government as a result of the searches and seizures.

Respectfully submitted,

/s/ J. William Lucco
J. William Lucco, #01701835IL
Lucco, Brown, Threlkeld & Dawson, LLP
225 St. Louis Street
Edwardsville, Illinois 62025
(618) 656-2321
Email:  blucco@lbtdlaw.com

/s/ Michael J. Gorla
Michael J. Gorla, #26399MO
555 Washington Avenue, Suite 600
St. Louis, Missouri 63101
(314) 621-1617
(314) 621-7448 - Facsimile
Email:  mjgorla@msn.com

/s/ Maria A. Pedraza
Maria A. Pedraza, #317458PA
James J. McHugh, Jr., #48308PA
Hunter S. Labovitz, #204760PA
Federal Community Defenders for the
Eastern District of Pennsylvania
601 Walnut Street, Suite 540W
Philadelphia, Pennsylvania 19106
(215) 928-1100
(215) 928-1112 - Facsimile
Email:  maria_pedraza@fd.org
Email:  james_mchugh@fd.org
Email:  hunter_s_labovitz@fd.org

31

## CERTIFICATE OF SERVICE

I hereby certify that on April 1, 2021, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:  Mr. Thomas Rea and Ms. Erin Granger, Assistant United States Attorneys, 111 South 10th Street, 20th Floor, St. Louis, Missouri 63102 and Ms. Sonia Jimenez, Esq., Capital Case Section, U.S. Department of Justice, 950 Pennsylvania Avenue NW, Washington, D.C. 20530.

/s/ Maria A. Pedraza_____
MARIA A.PEDRAZA
Assistant Federal Defender

32